IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

STEVEN L. CLAYTON,                :        Case No. 3:11-cv-266

            Petitioner,                        District Judge Thomas M. Rose
                                 :        Magistrate Judge Michael J. Newman
      vs.

WARDEN, CORRECTIONS              :
MEDICAL CENTER,

            Respondent.              :

---

## REPORT AND RECOMMENDATION[1]

---

Pursuant to 28 U.S.C. § 2254, Petitioner Steven L. Clayton ("Petitioner" or "Clayton")

brings this petition for a writ of *habeas corpus*.  He pleads six grounds for relief:

GROUND ONE:  Petitioner's conviction of one count of aggravated theft (F3) in
violation of R.C. § 2913.02(A)(2) violated his right to due process of law in
violation of the Fourteenth Amendment to the United States Constitution.  It was
not supported by sufficient evidence to enable a rational trier of fact to find guilty
beyond a reasonable doubt;

GROUND TWO:  Petitioner's convictions of sixteen counts of money laundering
(F3), being ten counts in violation of R.C. § 1315.55(A)(3), violated his right to
due process of law in violation of the Fourteenth Amendment to the United States
Constitution.  They were not supported by sufficient evidence to enable a rational
trier of fact to find guilt beyond a reasonable doubt;

GROUND THREE:  Petitioner's convictions of two counts in engaging in a
pattern of corrupt activity (F1) in violation of R.C. § 2923.32(A)(1) violated his
right to due process of law in violation of the Fourteenth Amendment to the
United States Constitution. They were not supported by sufficient evidence to
enable a rational trier of fact to find guilty beyond a reasonable doubt;

GROUND FOUR:  Petitioner's constitutional rights under the Double Jeopardy
and Due Process Clauses were violated when he was ordered to serve consecutive
sentences for allied offenses;

---
[1]Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

GROUND FIVE:  Petitioner's constitutional rights were violated under the Due Process Clause and under prohibitions against cruel and unusual punishment when the trial court failed to impose minimum, concurrent sentences for offenses committed in the year 2002, and prior years; and

GROUND SIX:  Petitioner was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Doc. 2 at PageID 23-30 (capitalization altered).

## I.  BACKGROUND

Petitioner, having waived his right to a jury trial, *see* doc. 6-3, was tried in the Montgomery County, Ohio Court of Common Pleas on June 6 and 7, 2007 before Judge William McCracken (a visiting judge).  *See* doc. 6-20.  After the presentation of testimony and evidence, the parties briefed their closing arguments.  *See* docs. 6-4, 6-5, 6-6.  The court found Petitioner guilty of one count of aggravated theft; two counts of engaging in a pattern of corrupt activity; and sixteen counts of money laundering.  Doc. 6-7; doc. 10 at PageID 111-16.  Petitioner was sentenced to a total of twelve years imprisonment:  five years for the aggravated theft count; one year for each of the sixteen counts of money laundering, to be served concurrently; and six years for one merged count of engaging in a pattern of corrupt activity.  Doc. 6-7.  The court also ordered Petitioner to pay restitution in the amount of $7,070,183.76.  *Id.*

### A.  Factual Background

The Montgomery County Ohio Court of Appeals summarized the facts underlying Petitioner's convictions as follows:[2]

Clayton was the president and owner of Equity Land Title Agency, Inc. (hereinafter "ELTA"), an Ohio corporation that acted as a real estate title agency as well as a title insurance agency. ELTA was headquartered in Vandalia, Ohio.

---

[2] These factual findings are presumed to be correct because Petitioner has not rebutted that presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007).

ELTA had been in existence since 1986 when Clayton filed the company's articles of incorporation with the Ohio Secretary of State.

Upon its inception, ELTA contracted with underwriter, First American Title Insurance Company ["First American Title"], for Clayton to be a title agent who wrote policies on First American's behalf. In addition to drafting title insurance policies, Clayton was also permitted to hold money in escrow accounts for clients who were awaiting closing dates on real estate purchases. Pursuant to R.C. § 3953.23(B), a title insurance agent can maintain escrow accounts in order to hold clients' funds for future real estate closings; however, the title agent must maintain the escrow accounts separate from the title agency's business operating account. In short, the escrow funds may not be commingled with funds held by the title agent for any other purpose.

In March of 2002, Margarita Vandergoorbergh (Rita), an auditor employed by First American Title, conducted a review of ELTA's escrow accounts. During the course of the review, Rita discovered that ELTA's escrow accounts were short by a considerable amount of money. Further investigation resulted in the discovery that Clayton had written checks withdrawing money from the escrow accounts and then deposited said checks in ELTA's business operating account. By the end of her investigation, Rita was able to determine that Clayton had written over $6,000,000.00 in checks from the escrow accounts which were then deposited in ELTA's operating account. Clayton returned approximately $3,000,000.00 of the funds to the escrow accounts, but $3,100,000.00 was still missing. After being confronted with these findings, Clayton admitted that he had been transferring funds from his escrow accounts to his operating account since approximately 1990 or 1991 in order to keep his business running. Clayton was also unable to account for the additional funds which were still missing from the escrow accounts.

As a result, First American Title terminated its business relationship with Clayton. First American Title also took over ELTA in order to wind down its business operations. All of ELTA's financial accounts were frozen, and the business was subsequently dissolved.

*State v. Clayton*, No. 22937, 2009 Ohio App. LEXIS 5897, at *3-5, 2009 WL 5247521, at *1-2

(Ohio Ct. App. Dec. 30, 2009) (doc. 6-12 at PageID 269-70) (brackets added; footnote deleted).

## B. Petitioner's Appeal

With the assistance of counsel, Petitioner timely appealed the trial court's judgment to the Montgomery County Ohio Court of Appeals. *See* docs. 6-8, 6-9. Petitioner asserted the following assignments of error:

1. Appellant's conviction of theft was based upon insufficient evidence, and was against the manifest weight of the evidence;

3

2.        Appellant's convictions of money laundering were based upon insufficient evidence;

3.        Appellant's conviction of engaging in a pattern of corrupt activity was based upon insufficient evidence;

4.        The trial court erred in ordering restitution in the amount of $7,070,183.76;

5.        The trial court erred in failing to merge Appellant's convictions and sentences;

6.        The trial court erred in failing to impose minimum, concurrent sentences for offenses committed prior to the Ohio Supreme Court's decision in *State v. Foster*; and

7.        Appellant was deprived of the effective assistance of counsel.

Doc. 6-9 at PageID 161-62 (capitalization altered; italics added).  On December 30, 2009, the Ohio Court of Appeals overruled all assignments of error, affirming the trial court's judgment. Doc. 6-12.  Petitioner, proceeding *pro se*, appealed that ruling to the Ohio Supreme Court, raising the same arguments.  *See* docs. 6-13, 6-14.  On May 5, 2010, the Supreme Court of Ohio dismissed his appeal as not involving any substantial constitutional question.  Doc. 6-16.

## II.  ANALYSIS

### A.  AEDPA Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when the state court decides a federal constitutional claim on the merits, the federal *habeas* court must defer to the state court decision unless: (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).   A state court decision is "contrary to" clearly established

federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08.  "A state court's determination that a claim lacks merit precludes *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786 (2011) (citation omitted).

In reviewing a *habeas* petitioner's claims under 28 U.S.C. § 2254(d)(1), the Court is "limited to the record that was before the state court." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).  Further, a state court's factual findings are presumed correct unless the petitioner rebuts them by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This statutory presumption of correctness also extends to factual findings made by a state appellate court's review of the trial record.  *Girts*, *supra* note 2, 501 F.3d at 749.

Under principles of comity, the state courts should have the first opportunity to hear *habeas* claims.  *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999).  Accordingly, a federal *habeas* petitioner must exhaust his or her state court remedies -- by fairly presenting his or her constitutional claims to the state's highest court -- before raising them in federal court.  28 U.S.C. § 2254(b); *O'Sullivan*, 526 U.S. at 844-45.  If (1) the state court rejected the petitioner's claim based on his or her failure to comply with a state procedural rule, or (2) the petitioner failed to exhaust his or her state court remedies and no avenue of relief remains open, or it would otherwise be futile to pursue the state remedies, the petitioner has waived that claim for *habeas*

review under the procedural default doctrine.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

### B.  Grounds One, Two and Three

In Grounds One, Two and Three, Petitioner argues that his convictions are supported by insufficient evidence to satisfy the Due Process Clause of the Fourteenth Amendment.   All three grounds for relief were exhausted in the state courts, and properly preserved for *habeas* review. In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  The test for analyzing sufficiency-of-the-evidence claims, established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (*en banc*) (emphasis in original). This standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324 n.16).  The Court should not "substitute its opinion as to the weight of the evidence or the credibility of witnesses."  *Benge v. Johnson*, 312 F. Supp. 2d 978, 1000 (S.D. Ohio 2004).

Not only is the *Jackson* standard itself demanding, but a *habeas* court must apply an additional level of deference in considering such claims under AEDPA.  *Davis*, 658 F.3d at 531. In reviewing a sufficiency-of-the-evidence claim under AEDPA deference, the Court's task is to determine whether it was "objectively unreasonable" for the state court, applying the *Jackson* standard, to conclude there was sufficient evidence to support the conviction.  *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).

## 1. Ground One

In Ground One, Petitioner challenges the sufficiency of the evidence to convict him of

aggravated theft.  Petitioner was convicted under Ohio Revised Code § 2913.02(A)(2), which

provides in relevant part as follows:

> (A)  No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
> 
> **...**
> 
> (2)  Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

Ohio Rev. Code § 2913.02(A)(2).

The Ohio Court of Appeals determined that this claim had no merit.  First, the Court set

out the proper *Jackson* standard for sufficiency-of-the-evidence claims as recited above.[3]  *See*

doc. 6-12 at PageID 271-72.  The Court then explained its reasoning for rejecting Petitioner's

claim:

> As he did during the trial, Clayton argues that since he owned the escrow accounts that the funds were withdrawn from, he cannot be found guilty of stealing money from himself. Clayton also asserts that even if he did not own the money in the escrow accounts, the State failed to adduce any evidence which established whose money it was. Clayton also contends that the State failed to establish what, if any, conditions were placed upon the utilization of the funds in the escrow accounts.
> 
> Initially, we note that the evidence adduced at trial clearly established that Clayton admitted on numerous occasions that he had transferred money from ELTA's escrow accounts into ELTA's business operating account in order to keep his title agency running. The statutory bar to the transfer of escrow funds to a title agency's operating account is found in R.C. § 3953.23(B), which states in pertinent part:
> 
> "(B) A title insurance agent may engage in the business of handling escrows of real property transactions provided that the agent shall maintain a separate record of all receipts and disbursements of escrow funds and shall not commingle any such funds with the agent's own funds or with funds held by the agent in any other capacity; and if at any time, the superintendent of insurance

---

[3] The Ohio Court of Appeals cited a Supreme Court of Ohio decision, which in turn cited *Jackson v. Virginia*, 443 U.S. 307 (1979).  *See* doc. 6-12 at PageID 271 (citing *State v. McKnight*, 107 Ohio St.3d 101, 112 (2005)).

determines that an agent has failed to comply with any of the provisions of this section, the superintendent may revoke the license of the agent pursuant to section 3905.14 of the Revised Code, subject to review as provided for in Chapter 119 of the Revised Code."

Black's Dictionary defines an "escrow account" as "a bank account generally held in the name of the depositor and an escrow agent which is returnable to depositor or paid to third person on the fulfillment of escrow condition: e.g. funds for payment of real estate taxes are commonly paid into escrow account of bank-mortgagor by mortgagee." 5th. Ed., 1979.

R.C. § 3953.23(B) permits an insurance title agent to maintain an escrow account which contains funds that are to be ultimately put toward the closing costs for purchases of real property. R.C. § 3953.23(B) also clearly states that the title agent is to keep the funds in the escrow account separate from funds being held by the agent in any other capacity. In effect, the title agent is allowed to hold the funds in the escrow account in trust for the respective purchaser until the date of closing. The title agent has no possessory interest in the funds in the escrow account. He or she merely maintains the account in order to store the funds until the date the funds are needed to complete the sale of property. After the closing has been completed, the title agent may then claim a portion of the funds as money earned by the agent as fees or premiums.

In the instant case, Clayton maintained escrow accounts in which to hold his clients' funds until the date of closing. The funds did not belong to Clayton. Clayton's only duty in regards to the funds held in the escrow account was merely to maintain the money in the accounts until said funds were necessary to complete the closing. Clayton, however, withdrew large amounts of money from the escrow accounts on numerous occasions prior to the closings and deposited the money in his title agency's business operating accounts. Clayton's actions in this regard were in clear contravention of R.C. § 3953.23(B). More importantly, though, Clayton only returned approximately half of the over six million dollars which he originally withdrew from the account to the escrow account. At the time of trial, the remaining funds totaling over $3.1 million dollars that Clayton withdrew from the escrow accounts were still missing. Clearly, the individual owners' interest in these funds were stolen from them without their knowledge or consent.

The evidence presented at trial, in the form of testimony from Mike Waiwood, Sam Halkias, and Rita [Vandengoorbergh] established that Clayton admitted to transferring funds from the ELTA escrow accounts to ELTA's business operating account. The transferred funds did not represent earned premiums or fees due Clayton. Clayton merely took the funds from the escrow account for his business and personal use and did not pay a substantial portion of the money back. Thus, the State adduced sufficient evidence at trial to prove that Clayton both intended to deprive and deprived the actual owners of the funds in the escrow accounts when he transferred the funds into his operating account.

8

Doc. 6-12 at PageID 272-75.[4]

In his *habeas* petition, Petitioner does not challenge the testimony of the state's witnesses, who testified that Petitioner admitted to transferring the funds from ELTA's escrow accounts to its operating account. Rather, Petitioner challenges the state court's characterization of the ELTA account as an escrow account, and argues that Ohio Revised Code § 3953.23(B) (the statute prohibiting the commingling of funds in a title insurance agent's escrow account) did not apply to his actions. *See* doc. 10 at PageID 622-37, 657-62. The Court finds this argument unpersuasive. The trial court and the Ohio Court of Appeals appropriately classified ELTA's accounts -- from which Petitioner wrongfully transferred funds -- as escrow accounts and, therefore, properly relied on § 3953.23(B) in convicting Petitioner of theft. At least two of the ELTA accounts at issue were labeled as "escrow accounts" by the banks. *See* doc. 6-20 at PageID 524-25. Further, contrary to Petitioner's arguments, and as the Ohio Court of Appeals indicated, there do not appear to be any strict requirements to create an escrow relationship under Ohio law. *See Union Sav. Bank v. Lawyers Title Ins. Corp.*, 946 N.E.2d 835, 841 (Ohio Ct. App. 2010); *Waffen v. Summers*, No. OT-08-34, 2009 Ohio App. LEXIS 2461, at *12-13, 2009 WL 1741731, at *4-6 (Ohio Ct. App. June 19, 2009). Indeed, the Ohio Revised Code contemplates an escrow relationship when a title insurance agent holds money for the prospective purchaser of real property until the date of closing. *See* Ohio Rev. Code § 3953.23(B).[5]

---

[4] This Court looks to the Ohio Court of Appeals' decision, as it was "the last state court to issue a reasoned opinion on the issue." *Payne v. Bell*, 418 F.3d 644, 660-61 (6th Cir. 2005).

[5] Additionally, Ohio Revised Code § 1349.20, titled "Escrow Transactions Concerning Residential Realty," provides the following relevant definitions: an "escrow account" means an account "used exclusively for the deposit of funds…that are received by the escrow or closing agent to effect an escrow transaction," Ohio Rev. Code § 1349.20(B); and an "escrow transaction" means "a transaction in which a person, for the purpose of effecting and closing the sale, purchase, exchange, transfer, encumbrance, or lease of an interest in residential real property, provides…[something] of value to an escrow or closing agent, to be held by the agent until a specified event occurs or until the performance of a prescribed condition." Ohio Rev. Code § 1349.20(E).

Petitioner also argues the state failed to prove beyond a reasonable doubt all the elements of aggravated theft, including: (1) he purposely deprived the owners of their property; (2) he knowingly obtained or exerted control over that property; and (3) his actions exceeded the scope of the property owners' consent for him to use the property. *See* doc. 10 at PageID 638-62. He claims the "purpose to deprive the property owners" element was not proven because he intended to repay the money to the escrow accounts. *See* doc. 10 at PageID 638-49. He further claims no one was deprived of closing funds until First American Title forced ELTA to dissolve. *See id.* According to Petitioner, had ELTA continued to operate, he could have repaid the deficiency in the escrow account.[6] *See id.*

While there may not be direct evidence of Petitioner having the purpose to deprive the property owners, a rational trier of fact could so conclude based on the circumstantial evidence presented at trial.[7] "A conviction may be sustained upon nothing more than circumstantial evidence." *Saxton*, 547 F.3d at 606. According to the state's witnesses, Petitioner admitted to transferring money from the escrow account in order to financially support ELTA, and also for his personal use. *See, e.g.*, doc. 6-20 at PageID 375-86, 488-92, 553-55. For example, Michael Waiwood, a former officer and employee of First American Title, testified as follows on direct examination:

---

[6] The state presented evidence that one of ELTA's escrow accounts was used in approximately 450 real estate closings per month, a total of $160 to $180 million being held in escrow each month. Doc. 6-20 at PageID 497. With this volume of real estate transactions, Petitioner was able to disperse the funds due at the respective closings, even though the account was deficient, because there was sufficient money held in escrow from the other pending real estate transactions. *See id.* at PageID 575-80.

[7] "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Ohio Rev. Code § 2901.22(A). "Deprive" means to do any of the following: "(1) [w]ithhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration; (2) [d]ispose of property so as to make it unlikely that the owner will recover it; (3) [a]ccept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration." Ohio Rev. Code § 2913.01(C).

Q.     So[,] relative to the March 25th, the afternoon meeting, what did Mr. Clayton state?

A.     Mr. Clayton stated that he had transferred money the beginning of 1990, 1991, from his escrow accounts to his operating accounts.

Q.     For what purpose, did he say?

A.     Well, he said that he had gone through a divorce. He said that he had transferred money. And this practice he said continued all through the nineties up until 2002, where he said that as late as January of '02 he had transferred $250,000 from his escrow account to his operating account, but during all that period of time he had transferred monies to supplement his operating expenses, to meet payroll, to pay his remittances due First American, that is the underwriter's share of the premium collected.

       He had told us about that he had, you know, taken trips, that he had, that he had -- actually he had a trip scheduled to take employees to someplace that was going to cost $50,000 within the next few weeks in fact.

       So, you know, he had used this money for personal money, this trust money for personal money, and actually gave me a list on a sheet, a year by year, from I believe the sheet initially was from 1995 through 2002 of exact amounts to the penny of monies he had taken from the escrow account to his operating account.

Q.     And this was a sheet that Mr. Clayton himself prepared?

A.     Yes, that's correct.

Q.     Did he indicate whether he returned these monies from operating to escrow?

A.     He said that the total may not be that high because he did on occasion, on a couple of occasions, pay back so to speak sums to the escrow accounts, but the amount paid back was a very small percentage of the total amount taken.

Doc. 6-20 at PageID 380-82.

Based on this evidence, and other similar testimony, the judge reasonably found

Petitioner had the purpose to "deprive" as defined in Ohio Rev. Code § 2913.01(C).  *Cf. Saxton*,

547 F.3d at 606-07 (finding there was sufficient circumstantial evidence for a reasonable factfinder to conclude defendant had a motive to commit theft).  Indeed, Ohio courts have upheld theft convictions under similar circumstances.  *Cf. State v. Moore*, No. 24957, 2012 Ohio App. LEXIS 3192, at *1-2, *14-15, *25-26, 2012 WL 3255031, at *1, *5, *9 (Ohio Ct. App. Aug. 10, 2012) (upholding a theft conviction where a title insurance agent withdrew money from her company's escrow account for her personal use); *State v. Noe*, Nos. L-06-1393, L-09-1193, 2009 Ohio App. LEXIS 5825, at *12-18, 2009 WL 5174163, at *5-7 (Ohio Ct. App. Dec. 31, 2009) (finding there was sufficient evidence to support a theft conviction under § 2913.02(A)(2) when defendant, the sole manager of a company, took company funds for personal use); *State v. Wilson*, No. 05AP-747, 2006 Ohio App. LEXIS 2968, at *1-11, 2006 WL 1681444, at *1-4 (Ohio Ct. App. June 20, 2006) (finding sufficient evidence to show defendant committed theft under § 2913.02(A)(2) where defendant transferred money back and forth between her employer's bank account and her personal bank account, even though her employer did not actually lose any money); *State v. Lloyd*, No. 94-J-43, 1996 Ohio App. LEXIS 3182, at *1-2, *10-12, 1996 WL 420210, at *1, *4 (Ohio Ct. App. July 25, 1996) (finding sufficient evidence to convict defendant of theft under § 2913.02 where defendant-guardian withdrew funds from his wards' trust accounts for his personal use without the consent of the Probate Court, even though all funds were subsequently accounted for).

Further, Petitioner's argument -- that there was no deprivation suffered by the owners of the property (*e.g.*, real estate closing money) because the parties to the real estate transaction lost their ownership rights when their money was placed in the escrow account -- is unavailing. Under Ohio law, "[t]he gist of a theft offense is the wrongful taking…. The important question is not whether the person from whom the property was stolen was the actual owner, but rather

whether the defendant had any lawful right to possession." *State v. McKoy*, No. 74763, 2000 Ohio App. LEXIS 571, at *24, 2000 WL 193142, at *9 (Ohio Ct. App. Feb. 17, 2000); *see also Moore*, 2012 Ohio App. LEXIS 3192, at *14-15.

Additionally, there was sufficient evidence presented at trial to satisfy the "knowingly obtain or exert control over property" element. *See* Ohio Rev. Code § 2913.02(A). The term "knowingly," as used in this statute, means a person "regardless of his purpose…is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Ohio Rev. Code § 2901.22(B). The testimony presented at trial -- that Petitioner admitted to withdrawing money from ELTA's escrow accounts -- sufficiently demonstrates that he knowingly exerted control over the money held in escrow. *Accord Lloyd*, 1996 Ohio App. LEXIS 3182, at *2, *10-12.

Finally, the Court finds there was sufficient evidence presented at trial to reasonably infer that Petitioner's taking of the escrow money was "[b]eyond the scope of the express or implied consent of the owner or person authorized to give consent." *See* Ohio Rev. Code § 2913.02(A)(2). As the Ohio Court of Appeals explained, under Ohio Revised Code § 3953.23(B), a title insurance agent is prohibited from commingling escrow funds with the agent's own funds or funds held by the agent in another capacity. *See* doc. 6-12 at PageID 272-74. Petitioner, as an escrow agent, was required to maintain the funds in the escrow account until they were needed for the real estate closing. *See id.* Pursuant to this statutory prohibition, the Ohio Court of Appeals reasonably determined that Petitioner did not have consent to withdraw funds from ELTA's accounts and deposit the funds into its operating account. *Accord Moore*, 2012 Ohio App. LEXIS 3192, at *25-26.

Accordingly, the Ohio Court of Appeals reasonably determined that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of aggravated theft under Ohio Revised Code § 2913.02(A)(2) were proven beyond a reasonable doubt.  Ground One, therefore, should be dismissed.

### 2. Ground Two

In Ground Two, Petitioner argues that his sixteen counts of money laundering are supported by insufficient evidence to sustain a conviction against him under the Due Process Clause.  *See* doc. 10 at PageID 680-91.  Petitioner was convicted of ten counts of money laundering in violation of Ohio Revised Code § 1315.55(A)(1), and six counts of money laundering in violation of Ohio Revised Code § 1315.55(A)(3).  Subsection (A) of the statute provides, in relevant part, as follows:

> (1)  No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity.
>
> ***
>
> (3)  No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.

Ohio Rev. Code § 1315.55(A).  Petitioner does not dispute that he conducted the transactions constituting money laundering.[8]  *See* doc. 10 at PageID 680-91.  Rather, he argues the prosecution failed to prove that he *knew* the transactions involved the proceeds of *unlawful activity* and he had the *purpose* of committing or furthering corrupt activity under § 1315.55(A)(1); or that he purposely acted to promote, manage, establish, carry on, or facilitate

---

[8]  The state presented evidence of ten transactions which constituted money laundering under § 1315.55(A)(1), six of which also constituted money laundering under § 1315.55(A)(3).  *See* doc. 10 at PageID 728.  For each transaction, the state submitted a copy of the escrow account bank statement showing the withdraw of money; the actual check from the escrow account paid to the operating account; and a copy of the operating account bank statement showing the check being deposited.  *See* doc. 6-20 at PageID 497-511.

the promotion, management, establishment, or carrying on of corrupt activity under § 1315.55(A)(3). *See* doc. 10 at PageID 680-91.

The Ohio Court of Appeals reviewed this claim, and reasonably determined that it had no merit. In doing so, the court first recited elements of the offenses under Ohio Revised Code §§ 1315.55(A)(1) and (3), and then explained as follows:

> As we held in our analysis of Clayton's first assignment, the State adduced sufficient evidence to find Clayton guilty beyond a reasonable doubt of the aggravated theft of the funds from ELTA's escrow accounts. The State also established that after he illegally withdrew funds from the escrow accounts, Clayton transferred the money into ELTA's business operating account and did not return a substantial portion of the money to the escrow accounts. The State also adduced evidence which established that the transfer of the funds from the escrow accounts to the operating account was in no way related to the collection of earned fees for services rendered by Clayton to his clients. Each act of depositing the individual checks withdrawn from the escrow accounts into the operating account for Clayton's own personal benefit was a clear violation of R.C. § 1315.55(A)(1).
>
> ***
>
> After a thorough review of the record, we find that the State presented sufficient evidence which established that Clayton deposited funds from the escrow accounts into his operating account. Moreover, these transactions were conducted with the purpose of facilitating a corrupt activity, namely Clayton's ongoing theft of funds from the escrow account.

Doc. 6-12 at PageID 275-76.

Petitioner premises Ground Two, in part, upon his argument in Ground One -- that his aggravated theft count was unsupported by sufficient evidence. As discussed above, however, the Court finds Ground One to be without merit. Accordingly, Petitioner's theft conviction establishes that his transfers of money from ELTA's escrow account to its operating account constituted "unlawful activity." Likewise, these money transfers are considered "corrupt activity." *See* Ohio Rev. Code § 2923.31(I) (defining "corrupt activity" as a violation of various criminal statutes, including theft under Ohio Revised Code § 2913.02); *see also State v. Caver*, No. 91443, 2009 Ohio App. LEXIS 1100, at *30-32, 2009 WL 726145, at *11-12 (Ohio Ct. App.

Mar. 19, 2009) (affirming a money laundering conviction for which the "corrupt activity" was theft under § 2913.02); *cf. Noe*, 2009 Ohio App. LEXIS 5825, at *18-19 (upholding money laundering convictions where the company manager took company funds for personal use). Petitioner's assertion -- that he was unaware such conduct was illegal -- is not a defense to his conviction. *See Cheek v. United States*, 498 U.S. 192, 199 (1991) ("[I]gnorance of the law … is no defense to criminal prosecution").

Further, Petitioner's argument -- that the state failed to prove the requisite *mens rea* elements for his money laundering charges -- is unavailing. As noted above, a conviction may be supported solely by circumstantial evidence. *Saxton*, 547 F.3d at 606. In Petitioner's criminal trial, the state presented testimony from several witnesses that Petitioner admitted to transferring money from the ELTA escrow account to its operating account, and then used those funds for personal needs. *See, e.g.*, doc. 6-20 at PageID 375-86, 488-92, 553-55. For instance, Michael Waiwood testified that, when officers of First American Title confronted Petitioner about the deficient escrow account, Petitioner reacted as follows:

> Well, [Petitioner] said, you know, he was very clear, he admitted that he took the money, that he was, you know, certainly hopeful that he could restore it and that he would do anything that it took to pay it back.
> He would, he would mortgage his -- he would secure with his assets the obligation. He would try to raise money. He would turn over the business to First American and he would *even go to jail*."

Doc. 6-20 at PageID 383 (emphasis added). Such testimony, viewed in the light most favorable to the prosecution, is sufficient evidence from a which a reasonable trier of fact could infer that Petitioner knew his transactions involved the proceeds of unlawful activities, and he acted with the requisite purpose -- *i.e*, the "purpose of committing or furthering the commission of corrupt activity" under § 1315.55(A)(1); and the "purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity" under

16

(A)(3).   Accordingly, the Ohio Court of Appeals reasonably determined that, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to convict Petitioner of sixteen counts of money laundering under Ohio Revised Code §§ 1315.55 (A)(1) and (A)(3).  Ground Two, therefore, should be dismissed.

### 3.  Ground Three

In Ground Three, Petitioner argues that his two convictions -- for engaging in a pattern of corrupt activity -- are supported by insufficient evidence in violation of the Due Process Clause. *See* doc. 10 at PageID 691-700.  The statute under which Petitioner was convicted provides, "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."  Ohio Rev. Code § 2923.32(A)(1).

The Ohio Court of Appeals rejected Petitioner's argument on the merits as follows:

> R.C. § 2923.32(A)(1)provides, "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * * ." "'Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." R.C. § 2923.31(C). "'Pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. § 2923.31 (E).
>
> The court in *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr. Co.* (1994), 94 Ohio App.3d 75, 640 N.E.2d 235, pointed out that "[the Ohio pattern of corrupt activity statutes] are patterned after the Racketeering Influenced and Corrupt Organizations Act ('RICO'), Section 1961 et seq., Title 18, U.S. Code.*** In applying [the Ohio pattern of corrupt activity statutes], Ohio courts look to federal case law applying RICO."
>
> In *Cedric Kushner Promotions, Ltd. v. King* (2001), 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198, the U.S. Supreme Court applied RICO and specifically addressed the argument presently advanced by Clayton. In *King*, the plaintiff alleged that the defendant violated RICO statutes by engaging in a

pattern of corrupt activity in the conduct of his business. The defendant maintained that he could not be a "person" operating a separate "enterprise" because he was the president and sole shareholder of his closely held corporation. The U.S. Supreme Court held that the requisite distinctness between the defendant and his corporation was sufficient to establish that they were legally distinct entities, thus that the defendant, as the sole shareholder/officer/employee was the "person," and his corporation was the "enterprise."

Similar to the defendant in *King*, Clayton was the president and owner of ELTA. In that role, Clayton was the separate and distinct "person," while [] ELTA was the "enterprise" that he acted through when he engaged in a pattern of corrupt activity, to wit[:] aggravated theft and money laundering. Thus, the State adduced sufficient evidence to convict Clayton of engaging in a pattern of corrupt activity.

Doc. 6-12 at PageID 276-78 (brackets added).

Again, Petitioner does not dispute that he committed the acts underlying his "engaging in corrupt activity" conviction. Rather, he claims the state, basing his convictions only on those acts, has not established the requisite elements of the offense. Having already determined there is sufficient evidence to support Petitioner's theft and money laundering convictions, the "corrupt activity" element has been satisfied. *See* Ohio Rev. Code § 2923.31(I) (defining "corrupt activity" as a violation of various criminal statutes, including money laundering under Ohio Revised Code § 1315.55, and theft under Ohio Revised Code § 2913.02).

Petitioner first asserts there was no evidence of a *pattern* of corrupt activity because his numerous money transfers constituted a "single ongoing event." This argument has no merit. The state presented evidence that Petitioner illegally withdrew money from the escrow account during the period of 1995 until 2002, specifically providing documentation of ten transfers. *See* doc. 6-20 at PageID 381-82, 497-511. This constitutes a pattern of corrupt activity. *See* Ohio Rev. Code § 2923.31(E) (defining "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in

time and place that they constitute a single event"). *Cf. Fasheun v. Morgan*, No. 98-3535, 2000 U.S. App. LEXIS 8255, at *20-21 (6th Cir. Apr. 21, 2000) (finding sufficient evidence to support a "pattern of corrupt activity" under § 2923.32(A)(1) where the evidence showed defendant obtained a series of fraudulent loans on separate occasions); *State v. Baker*, No. 6-03-11, 2004 Ohio App. LEXIS 1799, at *11-13, 2004 WL 877688, at *3-5 (Ohio Ct. App. Apr. 26, 2004) (finding sufficient evidence of a "pattern of corrupt activity" under § 2923.32(A)(1) where the state presented testimony of several drug transactions).

Second, Petitioner argues the state failed to prove he was "employed by, or associated with, any enterprise" because in dealing with ELTA, he was in effect associating with himself. Citing *Cedrick Kishner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), the Ohio Court of Appeals correctly determined that Petitioner, in his role as the president and owner of ELTA, "was the separate and distinct 'person,' while the ELTA was the 'enterprise' that he acted through when he engaged in a pattern of corrupt activity, to wit[:] aggravated theft and money laundering."  Doc. 6-12 at PageID 277-78 (brackets added).  Other Ohio courts have made similar findings.  *See, e.g.*, *Noe*, 2009 Ohio App. LEXIS 5825, at *24-27; *State v. Theisler*, No. 2005-T-0106, 2007 Ohio App. LEXIS 198, at *8-13, 2007 WL 136102, at *2-4 (Ohio Ct. App. Jan. 19, 2007); *State v. Silverman*, Nos. 05AP-837, 05AP-838, 05AP-839, 2006 Ohio App. LEXIS 3791, at *67-70, 2006 WL 2075642, at *24-25 (Ohio Ct. App. July 27, 2006).

Accordingly, the Ohio Court of Appeals reasonably determined that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of "engaging in a pattern of corrupt activity" under Ohio Revised Code § 2923.32(A)(1) were proven beyond a reasonable doubt.  Ground Three, therefore, should be dismissed.

## C.  Ground Four

In Ground Four, Petitioner argues that his rights -- under the Double Jeopardy Clause of the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment -- were violated when he was convicted and sentenced for theft, money laundering, and engaging in a pattern of corrupt activity for the same conduct.  *See* doc. 10 at PageID 701-08.  The Ohio Court of Appeals reviewed this argument for plain error,[9] and determined there was no double jeopardy or due process violation, nor a violation of Ohio Revised Code § 2941.25.  The court stated, in relevant part:

> R.C. § 2941.25, Ohio's allied offense statute, protects against multiple punishments for the same criminal conduct, which could violate the Double Jeopardy Clauses of the United States and Ohio constitutions. It provides as follows:
>
> "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where this conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted for all of them."
>
> The Supreme Court of Ohio held that the elements of alleged allied offenses are to be compared in the abstract. *State v. Rance* (1999), 85 Ohio St.3d 632, P 1, 1999 Ohio 291, 710 N.E.2d 699 of the syllabus. In *Rance*, supra, the Supreme Court set out a two-part test to determine when convictions may be obtained for two or more allied offenses of similar import. In the first step, the elements of the offenses at issue are compared in the abstract to determine whether the elements correspond to such a degree that the commission of one offense will result in the commission of the other. *Id.* at 638. However, if a

---

[9] The Ohio Court of Appeals reviewed this claim for plain error only on the ground that Petitioner failed to raise this argument before the trial court.  *See* doc. 6-12 at PageID 281.  Ground Four, therefore, may be procedurally defaulted, as the court's plain error review was an enforcement of the procedural contemporaneous objection rule.  *See Hinkle v. Randle*, 271 F.3d  239, 244 (6th Cir. 2001).  Because Respondent did not assert a procedural default of Ground Four in its Return of Writ, *see* doc. 6, the Court declines to raise it *sua sponte* without first providing Petitioner an opportunity to respond to such an argument.  *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005).  AEDPA deference still applies when the state court reviews a case for plain error.   *See Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

defendant commits offenses of similar import separately or with a separate animus, he may be punished for both of them pursuant to R.C. § 2941.25(B). *Id.*, *State v. Jones* (1997), 78 Ohio St.3d 12, 13-14, 1997 Ohio 38, 676 N.E.2d 80.

***

Initially, we note that aggravated theft and money laundering are not allied offenses of similar import. Comparing the elements of these offenses in the abstract, it is apparent that commission of one of them will not necessarily result in commission of another. Aggravated theft requires proof that an individual deprived an owner of property or services, in conjunction with obtaining or exerting control over the property beyond the express or implied consent of the owner. Neither of the money laundering statutes contains those elements.

Moreover, the money laundering statutes Clayton was convicted under are not allied offenses. R.C. § 1315.55(A)(1) requires that an individual conduct a transaction knowing that the property involved are proceeds from some other unlawful activity. R.C. § 1315.55(A)(3) does not require that the transaction involve proceeds from an unlawful activity.

Finally, we find that the trial court did not err when it refused to merge the aggravated theft and money laundering counts with the count of engaging in a pattern of corrupt activity. Commission of engaging in a pattern of corrupt activity will not necessarily result in the commission of an aggravated theft or money laundering. "This is so because a conviction for engaging in a pattern of corrupt activity may be based on two or more violations of numerous other criminal statutes. See R.C. 2923.31(I) (identifying a multitude of crimes that qualify as 'corrupt activity')." *State v. Musselman*, Montgomery App. No. 22210, 2009 Ohio 424. Because a defendant need not engage in theft or money laundering in order to commit the offense of engaging in a pattern of corrupt activity and vice versa, the crimes are not allied offenses of similar import. Thus, the trial court did not err by refusing to merge his convictions for theft and money laundering with his conviction for engaging in a pattern of corrupt activity.

Doc. 6-12 at PageID 281-85.

The Double Jeopardy Clause protects a person from receiving multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). In application "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). The relevant question, therefore, is whether the Ohio legislature intended to punish the same conduct cumulatively. *See Ohio v. Johnson*, 467 U.S. 493, 499 & n.8 (1984); *Volpe v. Trim*, __ F.3d __, No. 11-4365, 2013 U.S. App. LEXIS

439, at *15-16, 2013 WL 70655, at *6 (6th Cir. Jan. 8, 2013).  In assessing the legislature's intent, the Court is "bound by a state court's construction of that state's own statutes."  *Volpe*, 2013 WL 70655, at *6 (quoting *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989)).  "Thus, for purposes of double jeopardy analysis, once a state court has determined that the state legislature intended cumulative punishments, a federal *habeas* court must defer to that determination."[10]  *Id.*

In this case, the Ohio Court of Appeals definitely stated that theft under Ohio Revised Code § 2913.02(A)(2); money laundering under Ohio Revised Code § 1315.55(A)(1); money laundering under Ohio Revised Code § 1315.55(A)(3); and engaging in a pattern of corrupt activity under Ohio Revised Code § 2923.32(A)(1) are not allied offenses of similar import within the meaning of Ohio Revised Code § 2941.25, and therefore may be separately punished.  *See* doc. 6-12 at PageID 282-85.  Accordingly, deferring to the Ohio Court of Appeals' determination -- that the Ohio legislature intended cumulative punishments for these statutes -- the Court finds that Petitioner's double jeopardy rights were not violated.[11]  *See Volpe*, 2013 U.S. App. LEXIS 439, at *15-22; *accord Cody v. Jeffreys*, No. 2:10-cv-974, 2013 U.S. Dist. LEXIS 6594, at *19-22, 2013 WL 170268, at *7-8 (S.D. Ohio Jan. 16, 2013).

---

[10]  The familiar test for Double Jeopardy violations is the *Blockburger* "same elements" test: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932); *see also United States v. Dixon*, 509 U.S. 688, 696-97 (1993).  The *Blockburger* test is a "rule of statutory construction," and "not a constitutional test in and of itself," however.  *Volpe*, 2013 U.S. App. LEXIS 439, at *16 (internal quotations and citations omitted).  It guides federal courts in determining congressional intent regarding cumulative punishment of federal statutes.  *Banner*, 886 F.2d at 781.  To the extent the *Blockburger* test is applicable here, it has been satisfied.  As set forth in the Ohio Court of Appeals' analysis, the offenses for which Petitioner was convicted -- aggravated theft, money laundering, and engaging in a pattern of corrupt activity -- each contain distinct elements from one another.

[11]  In making this finding, the Court recognizes that the Ohio Supreme Court, in *State v. Johnson*, 942 N.E.2d 1061 (Ohio 2010), subsequently overruled the then-controlling *Rance* test for allied offenses, applicable when Petitioner's appeal was decided.  *Id.* at 1069-70.  (The Supreme Court of Ohio dismissed Petitioner's appeal on May 5, 2010, *see* doc. 6-16, and *Johnson* was decided on December 29, 2010.)  However, as the Sixth Circuit recently clarified, the new test established in *Johnson* does not apply retroactively, and is therefore inapplicable to Petitioner's case.  *See Volpe*, 2013 U.S. App. LEXIS 438, at *29-30, *36-37.

### D.  Ground Five

In Ground Five, Petitioner claims his rights under the *Ex Post Facto* and Due Process

Clauses, and the Eighth Amendment's prohibition against cruel and unusual punishment, were

violated when he received non-minimum, consecutive sentences for his convictions.  *See* doc. 10

at PageID 708-19.    As a preliminary matter, Petitioner's Eighth Amendment claim is

procedurally defaulted because he did not fairly present this argument to the Ohio Court of

Appeals.  *See Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004).  In his state court appellate

briefs, there is no mention of the Eighth Amendment or "cruel and unusual punishment."   *See*

doc. 6-9 at PageID 179-88; doc. 6-14 at PageID 308-09.  Conversely, this claim fails on the

merits because a sentence within the statutory maximum -- such as Petitioner's -- generally does

not constitute cruel and unusual punishment under the Eighth Amendment.  *Austin v. Jackson*,

213 F.3d 298, 302 (6th Cir. 2000).[12]

With respect to his remaining arguments in Ground Five, Petitioner asserts it was

unconstitutional for the trial court to retroactively apply the statutory sentencing scheme -- that

came into effect after the Ohio Supreme Court's decision in *State v. Foster*, 845 N.E. 2d 470,

494-98 (Ohio 2006) -- in sentencing him for acts which occurred prior to *Foster*.[13]  *See* doc. 10 at

---

[12] The statutory range of imprisonment for aggravated theft and money laundering -- third-degree felonies, *see* Ohio Rev. Code §§ 1315.99(C); 2923.02(A)(2) (2005) -- is one to five years. Ohio Rev. Code § 2929.14(A)(3) (2005).  The statutory range of imprisonment for engaging in a pattern of corrupt activity -- a first-degree felony, *see* Ohio Rev. Code § 2923.32(B)(1) (2005) -- is three to ten years. Ohio Rev. Code § 2929.14(A)(1) (2005). Petitioner was sentenced to five years on the aggravated theft count; one year for each money laundering count (to be served concurrently); and six years for one merged count of engaging in a pattern of corrupt activity.  Doc. 6-7.

[13] Before *Foster*, Ohio Revised Code § 2929.14(B) required the sentencing court to make certain factual findings (*e.g.*, "the offender has previously served a prison term"; or the shortest prison term "will demean the seriousness of the offender's conduct") by a preponderance of the evidence before imposing a more-than-the-minimum prison term.  *See Foster*, 845 N.E.2d at 489-90.  Likewise, the sentencing court was required to make certain factual findings (*e.g.*, "that at least two of the offenses were committed as part of a course of conduct[,] and the harm was so great or unusual that no single prison term adequately reflects the seriousness of the conduct") before imposing consecutive sentences.  *See id.* at 490-91.  In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the U.S. Supreme Court held the Sixth Amendment

PageID 708-19. The Ohio Court of Appeals considered this argument for plain error review[14]

and rejected it as follows:

> Initially, it should be noted that this court is bound to follow the decision of the Ohio Supreme Court in *Foster*. *State v. Smith* (Aug. 25, 2006), Montgomery App. No. 21004, 2006 Ohio 4405. We "cannot overrule or modify *Foster*." *State v. Newman* (Aug. 9, 2006), Summit App. No. 23038, 2006 Ohio 4082. We do not have the jurisdiction to declare *Foster* unconstitutional. *State v. Durbin* (Sept. 29, 2006), Greene App. No. 2005-CA-134, 2006 Ohio 5125. "Moreover, even if we were not bound by the mandate in *Foster*, we do not believe that the Ohio Supreme Court's holding in that case operates as an *ex post facto* law." *Smith*, supra, 2006 Ohio 4405.
>
> The United States Constitution, Article I, Section 10, provides that no State shall pass an *ex post facto* law. *Id.* The United States Supreme Court stated that "[t]he *Ex Post Facto* Clause, by its own terms, does not apply to the courts." *Rogers v. Tennessee* (2001), 532 U.S. 451, 460, 121 S.Ct. 1693, 149 L.Ed.2d 697. Retroactive judicial decision-making is limited by the due process concept of fair warning, not by the *ex post facto* clause. *State v. Bruce* (2007),170 Ohio App.3d 92 , 2007 Ohio 175, 866 N.E.2d 44; see *Rogers v. Tennessee*, 532 U.S. at 459. "With respect to judicial decisions, fair warning is violated when the judicial interpretation is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id.*; see *Rogers v. Tennessee*, 532 U.S. at 461, 462; see also *Bouie v. Columbia* (1964), 378 U.S. 347, 354, 84 S.Ct. 1697, 12 L.Ed.2d 894.
>
> Additionally, we note that in *State v. Elmore*, 122 Ohio St.3d 472, 2009 Ohio 3478, 912 N.E.2d 582, the Ohio Supreme Court recently held that a defendant's re-sentencing under *Foster* for offenses that occurred prior to that decision did not violate the *ex post facto* clause. In light of the Supreme Court's holding in *Elmore*, Clayton's argument is without merit. Thus, the trial court did

---

requires that any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *Id.* at 490. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court explained that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 303 (emphasis in original). Following *Blakely*, the Supreme Court of Ohio found parts of the Ohio sentencing scheme -- that required judicial fact-finding before imposing consecutive sentences or sentences beyond the statutory minimum -- were unconstitutional. *Foster*, 845 N.E.2d at 494-99. Thus, the court severed those portions of the statute. *Id.* at 496-99. As a result of the severance, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences." *Id.* at 498. Petitioner was sentenced after *Foster*; accordingly, the sentencing judge had full discretion to impose a sentence within the statutory range, without first making additional findings. *See* doc. 6-7.

[14] The Ohio Court of Appeals reviewed this claim for plain error only on the grounds that Petitioner failed to raise this argument before the trial court. *See* doc. 6-12 at PageID 285. Although this ground for relief may also be procedurally defaulted, for the reasons stated in note 9, *supra*, the Court declines to raise the issue of procedural default *sua sponte*.

not err when it sentenced Clayton to non-minimum, consecutive sentences for his offenses.

Doc. 6-12 at PageID 285-86 (italics added).

To the extent Petitioner asserts this claim under the *Ex Post Facto* Clause, his argument is unavailing. The *Ex Post Facto* Clause prohibits the legislative enactment of any law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Rogers*, 532 U.S. at 456 (citation omitted). The Clause does apply to judicial acts, however. *Id.* Rather, a challenge to a judicial decision on *ex post facto* grounds is properly made under the Due Process Clause. *Ruhlman v. Brunsman*, 664 F.3d 615, 620 (6th Cir. 2011). Retroactive judicial decision-making must comport with "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Rogers*, 532 U.S. at 459. Accordingly, "when examining whether a judicial interpretation of criminal law…violates [*ex post facto*] concerns, the relevant consideration is whether that decision is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Ruhlman*, 664 F.3d at 620 (quoting *Rogers*, 532 U.S. at 462).

Petitioner's *ex post facto* due process rights were not violated when the trial court sentenced him to non-minimum, consecutive sentences in accordance with post-*Foster* Ohio law. The *Foster* severance remedy did not alter the sentencing range for the offenses for which he was convicted. Petitioner correctly notes that, under the pre-*Foster* sentencing scheme, he was not subject to an increased prison term on the grounds that he previously served a prison term (if he had, in fact, not previously served a prison term); however, he nonetheless was subject to an increased sentence if the sentencing court determined "the shortest prison term authorized for the offense…[would] demean the seriousness of the offender's conduct or [would] not adequately

protect the public from future crime by the offender or others." Ohio Rev. Code § 2929.14(B) (2005). Further, he was subject to consecutive sentences upon a finding that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm…was so great or unusual that no single prison term…adequately reflects the seriousness of the offender's conduct." Ohio Rev. Code § 2929.14(E)(4)(b) (2005). Given Petitioner's repeated acts of illegally transferring large sums of money from ELTA's escrow account into its operating account over an extended period of time, the sentencing judge could have reasonably made such findings. Thus, both before and after *Foster*, Petitioner was on notice and had "fair warning" of the potential penalties he faced and of the trial court's discretion to impose those penalties. Further, this Court has repeatedly rejected arguments such as those made by Petitioner.[15] *See, e.g.*, *Ruhlman*, 664 F.3d at 619-24; *Smith v. Brunsman*, 626 F. Supp. 2d 786, 793-95 (S.D. Ohio 2009); *Hooks v. Sheets*, No. 1:07-cv-520, 2008 U.S. Dist. LEXIS 77612, at *8-13, 2008 WL 4533693, at *4-5 (S.D. Ohio Oct. 3, 2008), *aff'd*, 603 F.3d 316 (6th Cir. 2010).

Moreover, in rejecting Petitioner's *ex post facto* challenge to his non-minimum sentences, the Ohio Court of Appeals relied on *State v. Elmore*, 912 N.E.2d 582 (Ohio 2009). *Elmore*, in turn, relied on many federal Courts of Appeals decisions that reject similar *ex post facto* challenges to the remedial holding in *Booker*. *See id.* at 589. Accordingly, the Ohio Court of Appeals' decision -- that the there was no *ex post facto* due process violation in sentencing Petitioner to non-minimum, consecutive sentences -- was neither contrary to, nor an

---

[15] The Court acknowledges the dicta in the Sixth Circuit's *Ruhlman* decision: "It is possible that a defendant who served no prior prison term, who is sentenced to a greater-than-minimum term notwithstanding the absence of any of the statutory facts that were necessary to support a greater-than-minimum sentence pre-*Foster* could support an ex-post-facto-type due process claim." *Ruhlman*, 664 F.3d at 623. However, such circumstances are not present here. Although there is no evidence that Petitioner had served a prior prison term, the trial court could have reasonably found "the shortest authorized sentence…[would] demean the seriousness of the offender's conduct or [would] not adequately protect the public from future crime by the offender or others," Ohio Rev. Code § 2929.14(B) (2005), and imposed a non-minimum sentence on that basis.

unreasonable application of, clearly established federal law.  *Accord Ruhlman*, 664 F.3d at 624.

## E.  Ground Six

In Ground Six, Petitioner asserts ineffective assistance of counsel on the following grounds:

> Even recognizing scrutiny of counsel's performance to be highly deferential, Petitioner asserts that counsel for Petitioner made errors so serious that counsel was not functioning as the "counsel" guaranteed Petitioner by the Sixth Amendment. That deficient performance prejudiced Petitioner's defense. Counsel's errors were so serious as to deprive Petitioner of a fair trial.
>
> Counsel's decision not to fully investigate viable defenses and develop the related arguments regarding details of escrow law as presented in this Petition was unreasonable and could not be justified as [a] "tactical decision" to focus exclusively on alternative defenses. Counsel failed to make obviously meritorious arguments as to [the] legality of mitigating circumstances on which the trial court based its verdict. But for such errors by trial counsel, the result of the proceedings would have been different.
>
> Appellate counsel was ineffective in omitting the significant and obvious legal escrow issues from the appeal while pursuing issues that were clearly and significantly weaker.
>
> If this Court finds any of the Grounds in this Petition to have been procedurally defaulted for failure by Petitioner to raise such claims Pro Se in his State Supreme Court appeal as United States Constitutional claims, then Petitioner must have been "ineffective" counsel in that light.[16]

Doc. 2 at PageID 30-31 (brackets added).

To prevail on an ineffective assistance of counsel claim, a *habeas* petitioner "must point to specific errors in counsel's performance." *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 772 (N.D. Ohio 2007) (citing *United States v. Cronic*, 466 U.S. 648, 666 (1984)).  The only specific claim in Ground Six concerns counsel's alleged failure to investigate and develop a defense based on escrow law.  Respondent asserts that Ground Six is procedurally defaulted, *see* doc. 6 at PageID 48-55, and the Court agrees.

---

[16] Recognizing his final argument -- that he was ineffective counsel for himself -- has no merit, Petitioner states he is abandoning this claim in his Traverse.  Doc. 10 at PageID 720.  *See Faretta v. Cal.*, 422 U.S. 806, 835-36 (1975).

A *habeas* claim must be "fairly presented" to the state courts at each stage of the state appellate process. *O'Sullivan*, 526 U.S. at 847-48. "A claim may only be considered 'fairly presented' if the petitioner asserted both a factual and legal basis for his claim in state court." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003). In his state court appellate briefs, Petitioner argues ineffective assistance of counsel, but bases his claim solely on counsel's alleged failure to object to his sentence before the trial court. *See* doc. 6-9 at PageID 188-89; doc. 6-14 at PageID 310-11. Petitioner failed to raise the specific ineffective assistance of counsel argument he now raises in his *habeas* petition -- *i.e.*, his counsel was ineffective for failing to argue there were no escrow accounts. *See id.*; *accord Lundgren v. Mitchell*, 440 F.3d 754, 769 (6th Cir. 2006) (holding that six alleged instances of ineffective assistance of counsel were procedural default because those specific sub-claims were not raised on appeal); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (finding that an ineffective assistance of counsel claim was procedurally defaulted where the petitioner's argument in the state courts relied upon different grounds than in his *habeas* petition).[17]

Nonetheless, even assuming, *arguendo*, that this claim were not procedurally defaulted, such a claim fails on the merits. Contrary to Petitioner's assertion, his trial attorney cross-examined the state witnesses concerning the requirements of an escrow account and questioned whether such requirements were satisfied in Petitioner's case, *see* doc. 6-20 at PageID 459-63, 526-31; and, in his closing argument brief, contended there was no proof that the ELTA accounts

---

[17] Further, to the extent Petitioner bases this ineffective assistance of counsel sub-claim on facts outside the trial court record, his claim is procedural defaulted because he did not file a petition for post-conviction relief pursuant to Ohio Revised Code § 2953.21(A)(2). *See State v. Gibson*, 430 N.E.2d 954, 957 (Ohio 1980). The 180-day limitations period to file a petition for post-conviction relief in the trial court has long since passed, *see* Ohio Rev. Code § 2953.21(A)(1)(c)(2), and Petitioner has not shown that he would satisfy the requirements to file an untimely petition under Ohio Rev. Code § 2953.23(A). Accordingly, because it would be futile for Petitioner to present these claims to the state court now, he is procedurally barred from bringing them in his federal *habeas* proceedings. *See Williams*, 460 F.3d at 806.

qualified as escrow accounts.  *See* doc. 6-5 at PageID 125-26.  Moreover, Petitioner's appellate counsel raised similar arguments on appeal to the Ohio Court of Appeals.  *See* doc. 6-9 at PageID 171-72.  Accordingly, Ground Six should be dismissed.

### III. RECOMMENDATION

Based on the foregoing analysis, it is **RECOMMENDED** that Petitioner's § 2254 petition for a writ of *habeas corpus* be **DISMISSED** with prejudice, and this case be **TERMINATED** upon the Court's docket.

Reasonable jurists would not disagree with the recommended disposition on all grounds for relief.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Further, an appeal of an Order adopting this Report and Recommendation would not be taken in objective good faith.  *See* 28 U.S.C. § 1915(a)(3); *Coppedge v. United States*, 369 U.S. 438, 445-46 (1962).  Therefore, if Petitioner seeks to appeal an Order adopting this Report and Recommendation, the Court **RECOMMENDS** that Petitioner be **DENIED** a certificate of appealability and *in forma pauperis* status on such an appeal.

March 5, 2013                                     s/ **Michael J. Newman**
                                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B)(C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).